UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
VECTOR CAPITAL CORPORATION,

                      Plaintiff,                      11 Civ. 6259 (PKC)

        -against-                     MEMORANDUM
                                                       AND ORDER
NESS TECHNOLOGIES, INC.,

                      Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Vector Capital Corporation ("Vector") asserts that defendant Ness Technologies, Inc., ("Ness") breached an Exclusivity Agreement (the "Agreement") between Vector and Ness relating to Vector's possible purchase of Ness. Ness now moves to dismiss the Complaint for failure to state a claim on which relief can be granted. Because Vector fails plausibly to allege a breach of the Agreement or damages, Ness's motion is granted.

                                  BACKGROUND

        Vector is a privately-held company that "acts as a value investor in established technology businesses." (Compl. ¶ 6.) Ness is a "global provider of IT and business services." (Id. ¶ 7.) In January 2011, Vector and Ness began discussing Vector's possible acquisition of Ness. (Id. ¶¶ 10-11.) Vector was aware that Ness was having similar discussions with other potential acquirers at that time. (Id. ¶ 11.)

        On March 16, 2011, Vector and Ness entered into an Exclusivity Agreement. The Agreement placed three obligations on Ness that are currently relevant. First, Ness agreed to refrain from pursuing transactions with other potential acquirers, as follows:

> [Ness] Will not, and will cause its affiliates and its and their respective directors, officers, employees, members and managers (collectively, "Affiliates"), and will

direct, and use reasonable best efforts to cause, its investment bankers, agents, consultants, advisors and representatives (collectively, "Representatives") not to, directly or indirectly

>   (a) initiate, solicit or encourage any inquiries, discussions or proposals regarding,

>   (b) continue, participate in any way in, propose or enter into any negotiations or discussions with respect to,

>   (c) provide any non-public information relating to or in connection with, or

>   (d) authorize, propose or enter into any confidentiality agreement, term sheet, letter of intent, purchase agreement or other agreement, arrangement or understanding

>   Regarding, in all cases (i) a merger, reorganization, business combination or similar transaction involving [Ness], (ii) the acquisition of all or a material portion of the assets . . . of [Ness] or (iii) the acquisition of all or a material portion of the outstanding capital stock of [Ness], in each case other than involving . . . [Vector] or any of its Affiliates . . . (any such transaction, an "Alternative Transaction").

(Id. ¶ 12).  Second, Ness agreed that it would inform Vector "promptly (and in any event within one business day) of any inquiry, discussion, or proposal from any person or entity made to [Ness] . . . regarding an Alternative Transaction, including a summary of the material terms thereof."  (Id. ¶ 13.)  Third, Ness agreed that it would "[u]se reasonable best efforts to respond to all reasonable and customary data and information requests from [Vector]."  (Id. ¶ 14.)

On March 31, 2011, during the exclusivity period, Citi Venture Capital International ("CVCI") informed Ness of its interest in purchasing Ness.  Vector does not allege that Ness failed to inform Vector of this proposal or its material terms.  However, according to the Complaint, Ness "actively discussed" the CVCI proposal on March 31, April 1, April 6, and April 13, 2011.  (Id. ¶¶ 16-17, 19.)

On April 7, 2011, Ness received and reviewed a further communication from CVCI concerning its proposal, which included "prospective due diligence items." (Id. ¶ 18.) Ness did not disclose this communication to Vector. (Id.)

According to the Complaint, "from mid-April to mid-May 2011, Ness representatives continually created major and minor roadblocks to the completion of negotiations for the acquisition of Ness by Vector . . . . During the same period, Ness representatives also demanded immediate completion of negotiations despite Ness's failure to provide relevant information to Vector." (Id. ¶ 20.) The exclusivity period ended on May 20, 2011. (Id. ¶ 21.) On June 10, 2011, Ness announced an agreement to be acquired by CVCI at $7.75 per share, a price higher than Vector had ever offered. (Id. ¶ 22.)

DISCUSSION

I.     Standard of Review Under Rule 12(b)(6)

Ness moves to dismiss Vector's complaint under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant. See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). However, "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S.Ct. at 1949. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, because the Federal Rules "[do] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950.

II.     Choice of Law

Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state.  Accordingly, the Court will apply New York law.  See, e.g., Tehran-Berkeley Civil and Envtl. Engr's v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989) ("consent to use a forum's law is sufficient to establish choice of law").

III.    Documents Considered on this Motion

"If, on a motion to dismiss under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Rule 12(d), Fed. R. Civ. P.  However, a plaintiff's omission of documents related to the pleadings does not place them "outside the pleadings."  Instead, on a motion to dismiss a court may consider "documents . . . incorporated in [the complaint] by reference . . . or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. Amer. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)); see also Int'l Audiotext Network, Inc. v. AT&T, 62 F.3d 69, 72 (2d Cir. 1995) (considering contract between defendant and third party because amended complaint "relies heavily on its terms and effect"); Cortec Indus, Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991) (considering stock purchase agreement, offering memorandum, and warrant submitted by defendant and "referred to—but not attached or incorporated by reference—into plaintiff's complaint").

In this case, Ness has supplied, and Vector has objected to the Court's consideration of, the following documents: the full text of the Agreement, the amendments to the Agreement, the content of the March 31 and April 7 CVCI letters, and excerpts from a Ness

proxy statement describing the history of its sale to CVCI.  (Fleming Decl. Exs. 1-5, 7-8; Pl. Mem. Opp. Mot. to Dismiss 6-7.)  Because the Agreement and the meaning of its terms form the basis of this Complaint, the Court considers the entire Agreement.  See, e.g., Chambers, 282 F.3d at 153 ("The contracts . . . in this case comfortably meet th[e reliance] test because they are integral to the Amended Complaint.").  The Court also considers the content of the CVCI letters, because Vector refers to these letters in the Complaint and "relies heavily on [their] terms and effect[s]," Int'l Audiotext Network, 62 F.3d at 72, to support the allegation the Ness received and mishandled "inquir[ies], discussion[s], or proposal[s]" regarding an Alternative Transaction.  (Compl. ¶¶ 16, 18.)  The Court does not consider the proxy statement or the amendments to the Agreement, because plaintiff's Complaint neither references nor appears to rely upon these documents.

        IV.    Vector Fails to State a Claim for Breach of the Agreement.

"To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."  Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004) (New York law).  The Court assumes the existence of a valid contract.  However, none of the well-pleaded facts in the Complaint plausibly establishes a breach of the Agreement or damages.

        a.    Breach

Under New York law, a contract "must be enforced according to the plain meaning of the language chosen by the contracting parties," and analysis of whether any language is ambiguous requires considering the contract "as a whole."  Brad H. v. City of New York, 17 N.Y. 3d 180, 185-86 (2011) (internal citations omitted).  "The language of a contract is

not made ambiguous simply because the parties urge different interpretations.  Nor does ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'"  <u>Seiden Associates, Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992) (quoting <u>Bethlehem Steel Co. v. Turner Constr. Co.</u>, 2 N.Y.2d 456, 459 (1957)).  Finally, a court should not interpret a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."  <u>In re Lipper Holdings, LLC</u>, 766 N.Y.S.2d 561, 561 (1st Dep't 2003) (internal citations omitted).  As discussed below, the relevant terms of the Agreement are unambiguous, and Ness's alleged behavior did not breach those terms.

1. <u>Ness's "Discussions" of the CVCI Proposal</u>

Vector alleges first that Ness breached the Agreement by "actively discuss[ing]" CVCI's acquisition proposal.  (Compl. ¶ 16-17, 19.)  Vector does not make any specific allegation that these discussions were between Ness representatives and CVCI.  Instead Vector refers generally to discussions and argues that any discussion, "whether internal or external," violated the Agreement's requirement that Ness not "continue, participate in any way in, propose or enter into any negotiations or discussions with respect to" an Alternative Transaction.  (Pl. Mem. 8.)

The Agreement cannot reasonably be read to prohibit Vector from internal discussions of unsolicited proposals.  The prohibition on "discussions" is within a subparagraph requiring Ness representatives not to "enter into negotiations or discussions" regarding an Alternative Transaction.  (Compl. ¶ 12.)  The fair reading of "discussions," when found alongside "negotiations," which necessarily are third-party encounters, is that the prohibited discussions are also third-party encounters.  Also, the subparagraph is surrounded by

subparagraphs that likewise prohibit Ness from engaging in activities directed at or coming from third parties.  Subparagraphs (a), (c), and (d) require Ness representatives not to "initiate, solicit, or encourage any inquiries, discussions or proposals," not to "provide any non-public information," and not to "enter into any confidentiality agreement, term sheet, letter of intent, purchase agreement or other agreement."  (Id.)  None of these are actions Ness could have taken internally.  Most generally, these subparagraphs are part of an *exclusivity* agreement.  Ness did not make its relationship with Vector any less exclusive by discussing an unsolicited proposal internally.  Within the context of this Agreement as a whole, "enter[ing] . . . discussions" unambiguously means undertaking external discussions.

Moreover, interpreting the Agreement to prohibit Ness's officers from discussing unsolicited proposals would produce an unreasonable result:  Ness would be obligated by contract to violate governing law.  Ness is a Delaware corporation, and under Delaware law, a corporation's directors have a fiduciary duty to obtain the highest value for the corporation's shareholders when the company is sold.  See Revlon Inc. v. Macandrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del. 1986).  Contractual provisions that limit full exercise of fiduciary duties are "invalid and unenforceable" because "directors [cannot] contract away their fiduciary obligations."  Paramount Communications Inc. v. QVC Network Inc., 637 A.2d 34, 51 (Del. 1994).  Although these restrictions are grounded in Delaware law, it would be "commercially unreasonable [and] contrary to the reasonable expectations of the parties," Lipper, 766 N.Y.S.2d at 561, to interpret the contract to require a party to violate its existing business duties.  Here, if Ness had agreed not to discuss unsolicited proposals internally, it would have been unable to fulfill its duty under Delaware law of securing the highest sale value for its shareholders.  Indeed, no Ness employee other than the recipient of the March 31 letter would have been permitted

even to know that another bidder was in a position to offer a higher price than Vector was offering. Ness would not have knowingly put itself in this position, and the plain language of the Agreement indicates that Ness did not put itself in that position. The Agreement did not prohibit internal discussions.

As regards external discussions, Vector fails to make any well-pleaded factual allegation that external discussions took place. The Complaint alleges that "Ness representatives actively discussed the CVCI proposal." (Compl. ¶¶ 16; see id. ¶¶ 17, 19.) The Complaint conspicuously does not allege that Ness representatives had these discussions other than among themselves. In the context of a claim in which the extent of Ness's engagement with CVCI, if any, is critical, there is no reasonable inference that Vector meant to indicate that the discussions were between Ness representatives and CVCI but failed to make that specific allegation.[1]

### 2. Ness's Failure to Inform Vector of the CVCI's April 7 Letter

Vector alleges next that Ness breached the Agreement by failing to inform Vector of the April 7 letter from CVCI. Vector appears to argue that the Agreement required Ness to disclose any letter from a third party without regard to its content. (See Pl. Mem. 9.)

Taking the Agreement as a whole, the disclosure requirement unambiguously does not require Vector to disclose all letters from third parties. First, the Agreement requires Ness to disclose only an "inquiry, discussion, or proposal." (Compl. ¶ 13.) A letter is not a discussion, and not all letters make inquiries or proposals. Second, an "inquiry . . . or proposal" is subject to the disclosure requirement only if it "regard[s] an Alternative Transaction." (Id.)

---

[1] In a pre-motion letter, Ness indicated its position that internal discussions were the only discussions alleged, and that internal discussions were not prohibited. (Fleming Ltr., Oct. 11, 2011, at 2.) Vector was copied on the letter, and the Court's memorandum endorsement requiring a response from Vector was made on the face of the letter. (Order, Oct. 11, 2011, ECF No. 7.) However, when given the opportunity to amend its Complaint based on Ness's arguments, Vector declined. (See Order, Nov. 8, 2011, ¶ 1, ECF No. 10.)

Finally, because Vector's disclosure must "includ[e] a summary of the material terms" of the proposed Alternative Transaction (id.), it follows that Ness was not required to disclose letters setting forth no material terms.  Vector's more expansive understanding of the disclosure requirement "strains the contract language beyond its reasonable and ordinary meaning."  Seiden, 959 F.2d at 428.  Reasonably construed as a whole, the Agreement unambiguously required Ness to disclose only letters that set forth "material terms" "regarding an Alternative Transaction."

Here, the April 7 letter did not set forth "material terms" regarding CVCI's proposed Alternative Transaction.  By way of background, the first CVCI letter, which Vector does not allege it did not receive, did set forth material terms.  In the March 31 letter, CVCI indicated to Ness that it would be interested in purchasing all equity in Ness for $7.75 a share, detailed the basis of its interest in Ness, and outlined what it felt was attractive about a transaction with CVCI.  (CVCI Ltr., March 31, 2011, Fleming Decl. Ex. 7.)  But Vector does not allege that Ness failed to inform Vector of this first letter or the material terms of the Alternative Transaction proposed therein.  In the April 7 letter, CVCI offered details "further to [its] letter of March 31."  (CVCI Ltr., April 7, 2011, Fleming Decl. Ex. 8.)  Specifically, the April 7 letter indicated that CVCI would need to explore only two areas for diligence purposes, and it laid out proposed topics within those areas.  (Id. at 1.)  The April 7 letter concluded that the "interest and all conditions stated in the [March 31] letter remain[ed] in effect."  (Id. at 2.)  Assuming that the April 7 letter can be said to "regard" a transaction at all, it still was not subject to the disclosure requirement because it did not set out any "material terms," except by reference to the previously disclosed March 31 letter.  Accordingly, Ness did not breach the Agreement by not informing Vector of the April 7 letter.

### 3. Ness's Covenant of Good Faith and Fair Dealing

Finally, Vector alleges that Ness breached duties of good faith and fair dealing. "Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." Tractabel Energy Mktg., Inc. v. AEP Power Mktg., 487 F.3d 89, 98 (2d Cir. 2007) (citing Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995)).  The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (quoting Dalton, 87 N.Y.2d at 389). However, breach of this covenant "is merely a breach of the underlying contract," and a plaintiff cannot invoke the covenant to impose obligations not actually created by the contract. Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (quoting Geler v. Nat'l Westminster Bank USA, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)); see also In re Musicland Holding Corp., 386 B.R. 428, 438 (S.D.N.Y. 2008) ("The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms.")

Here, Vector alleges breaches of the covenant of good faith and fair dealing that would impose obligations on Ness that the Agreement did not create. Vector alleges that Ness breached the covenant by "creat[ing] major and minor roadblocks to the completion of the negotiations . . . [and by d]emand[ing] immediate completion of negotiations despite Ness'[s] failure to provide relevant information." (Compl. ¶ 20.) These vague allegations suggest that Ness obstructed the sale of Ness to Vector. But the Agreement did not require Ness to sell itself to Vector. In the Agreement, Ness promised no more than that it would refrain from engaging with third parties and that it would use "reasonable best efforts to respond to customary data and information requests." (Compl. ¶¶ 12, 14.) The Agreement expressly declared that its first

paragraph, which indicated that the parties were considering a transaction, was "not intended to create" and "shall not create, any legally binding obligations." (Exclusivity Agreement ¶ 4, Fleming Decl. Ex 2.) The parties agreed instead that neither they nor their representatives "ha[d] any legal obligation of any kind whatsoever with respect to the matters discussed" in the Agreement except for those specifically enumerated. (Id.) Again, the Agreement did not enumerate a requirement that Vector accept, consider, or even facilitate an offer of sale. Therefore, Vector cannot invoke the covenant of good faith and fair dealing to impose those requirements on Ness, and Vector fails to state a claim for breach of the covenant of good faith and fair dealing.

        b. <u>Damages</u>

This Court has concluded that Vector has not plausibly alleged a breach of the Agreement. But this is not the only defect in Vector's complaint. In a conclusory fashion Vector alleges that it has brought its action "to recover all damages arising from Ness'[s] breaches of the Exclusivity Agreement, including out-of pocket expenses and lost profits to the extent recoverable under the law of the State of New York." (Compl. ¶ 5.) Vector is required to plausibly allege damage that was caused by the breaches. <u>See</u> <u>Nat'l Mkt. Share</u>, 392 F.3d at 525 ("[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages.") (emphasis in original). Although plaintiff need not prove the elements of its claim in its pleadings, it must plausibly establish each element. <u>See</u> <u>Iqbal</u>, 129 S.Ct. at 1949-50.

In this case, Vector cannot plausibly tie its out-of-pocket expenses, e.g., the cost of conducting due diligence, to the breaches it has alleged. There is no claim that Ness's receipt of CVCI's March 31 proposal was a breach of the Agreement; nor is it alleged that Ness failed to

transmit the CVCI proposal to Vector. With notice of CVCI's proposal, Vector's due diligence would have allowed Vector to decide whether to stand pat or make a higher offer. There is no plausible allegation that the due diligence lost this value because Ness employees discussed the CVCI offer internally, did not inform Vector of the April 7 CVCI letter that announced no new material terms, or did not negotiate a sale to Vector with the alacrity that Vector desired. This is not a case where it is plausibly alleged that Ness agreed to be acquired during the exclusivity period and thereby destroyed the value of the due diligence. See, e.g., Amer. Family Svc. Corp. v. Michelfelder, 968 F.2d 667 (8th Cir. 1992) (affirming "out-of-pocket" damages for breach of no-shop clause when defendant contracted to sell to third party during exclusivity period). Instead, Ness remained for sale during the entire exclusivity period. Ness did not come to an agreement with CVCI until after the exclusivity period had expired. Therefore, Vector's due diligence retained the value it had always had: it allowed Vector to make the choice to continue to pursue Ness or to abandon its quest.

Vector also has not plausibly alleged that it lost profits as a result of the alleged breaches. For Vector to have tied its claim of lost profits to any breach by Ness, it would have had to plausibly allege that (1) the breaches caused it not to acquire Ness; and that (2) had it acquired Ness, it would have been a profitable transaction. Neither is self-evident. Vector fails to explain why, in view of the fiduciary obligations of the directors of Ness, it is plausible that the directors would have proceeded to close a deal on terms inferior to CVCI's proposal. It is pure speculation that Vector and Ness would have come to a final agreement, and it is again speculation as to what the terms of such an agreement would have been. New York law reflects this conclusion, to wit, that lost profits are too speculative to recover for breaches of preliminary contracts between negotiating parties. See Goodstein Constr. Corp. v. City of New York, 80

N.Y.2d 366, 372-73 (1992) ("law and logic preclude . . . recovery" of lost profits based on agreements that defendant would negotiate exclusively with plaintiff for sale of land, but not promising sale, because awarding lost profits "would be basing damages not on the exclusive negotiating agreements but on the prospective terms of a nonexistent contract which [defendant] was fully at liberty to reject.")  In accordance with New York law and because of the purely speculative nature of any allegation regarding lost profits, plaintiff fails plausibly to allege that any of Ness's alleged breaches of the Agreement deprived Vector of profits.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF No. 14) is GRANTED.

Defendant submitted a pre-motion letter outlining the basis of its proposed motion to dismiss. (Fleming Ltr., Oct. 11, 2011.)  Thereafter, at a pretrial conference, plaintiff was given the opportunity to amend its complaint.  In an Order following that conference, this Court noted, "Plaintiff has been offered the opportunity to amend but has declined.  This will be taken into account in any further request to replead." (Order, Nov. 8, 2011, ECF No. 10.)  When presented with the actual motion to dismiss, plaintiff still did not request leave to amend its complaint.  The Clerk of the Court is directed to enter judgment for the defendants.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 16, 2012

- 13 -